AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of California

**FILED**

Apr 25, 2025

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America | ) |
| v. | ) |
| | ) |
| | ) Case No.   2:25-mj-0072 JDP |
| TIMOTHY AUSTIN PANNELL | ) |
| | ) |
| | ) |
| _____ | ) |
| *Defendant(s)* | |

**SEALED**

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ February 11, 2024 _____ in the county of _____ El Dorado _____ in the
_____ Eastern _____ District of _____ California _____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. § 841(a)(1) | Distribution of fentanyl |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

_____
/s/ Preston Patton
*Complainant's signature*

Preston Patton, Special Agent, FBI
*Printed name and title*

Sworn to me and signed via telephone.

Date:   April 25, 2025

_____
*Judge's signature*

City and state:   Sacramento, CA

Jeremy D. Peterson, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDVIT IN SUPPORT OF COMPLAINT AND ARREST WARRANT FOR**</u>

<u>**TIMOTHY AUSTIN PANNELL**</u>

I, Preston Patton, being first duly sworn, hereby depose and state as follows:

### I.     <u>PURPOSE</u>

1.      I submit this affidavit in support of a request that the Court issue a Criminal Complaint and Arrest Warrant for **Timothy Austin Pannell**, for violations of 21 U.S.C. § 841(a)(1), distribution of fentanyl. Specifically, that Pannell distributed fentanyl, in violation of 21 U.S.C. § 841(a)(1), on or about February 11, 2024, in El Dorado County, California.

### II.     <u>AGENT BACKGROUND AND EXPERIENCE</u>

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed since July 2014. Since March 2020, I have been assigned to the South Lake Tahoe Resident Agency (RA) of the Sacramento Division of the FBI.

3.      While employed by the FBI, I have investigated federal criminal violations related to transnational organized crime, domestic terrorism, counter-intelligence, violent gangs, and child exploitation.

4.      During my training and through my experience, I received instruction in Title 21 of the United States Code, including, but not limited to Sections 841(a) and 846, as well an instruction in Title 18, Section 922.  In the course of my employment, I have participated in a number of investigations involving the use of federal and state warrants to collect evidence, including controlled substances, the seizure of narcotics-related records, firearms, and other types of evidence that document the activities of criminal organization in both the manufacturing and distribution of controlled substances and weapons. I have participated in a number of arrests of subjects for violations of both federal and state law, to include narcotics distribution.

5.      Prior to my employment in the FBI, I earned a commission at the U.S. Military Academy and served as an officer in the U.S. Army Infantry for six years.

6.      I am a federal law enforcement officer who is engaged in enforcing federal criminal laws, and I am authorized by the Attorney General to request an arrest warrant.

7.      The facts in this affidavit come from my personal observations, my training and

experience, and information obtained from other agents and witnesses. It does not set forth all my knowledge of this matter, but instead contains information sufficient to show there is probable cause for the requested complaint, arrest warrant, and search warrant.

8.      I have based my statements, opinions, and conclusions in this affidavit on my training and experience as an FBI Special Agent, my personal knowledge of the facts and circumstances obtained through my direct participation in this investigation, information gathered from other agents and law enforcement officers, their reports, photographic evidence, as well as from public records and law enforcement databases. I believe these sources to be reliable. I have described conversations and events in this affidavit in substance and relevant part, unless otherwise noted, rather than in their entirety or verbatim. This affidavit also reflects my current understanding of facts relating to this investigation, which may change as the investigation proceeds and the facts become more fully developed.

9.      Based on the facts set forth in this affidavit, there is probable cause to believe that **Timothy Austin Pannell** distributed fentanyl, a felony, in violation of 21 U.S.C. § 841(a)(1).

### III.      PROBABLE CAUSE

#### A.      Investigation Summary

10.     On February 12, 2024, four individuals, Victim-1, Victim-2, Victim-3, and Victim-4, were found dead from suspected fentanyl overdoses at 596 Roger Avenue, South Lake Tahoe, California. The evidence indicates that, on the night of February 11, 2024, Timothy Austin **Pannell**, a.k.a. "Frog," sold fentanyl to Victim-1 ("V-1"), and his brother, Victim-2 ("V-2"), in the parking lot of Sierra Community Church, in South Lake Tahoe, California. V-1 had intended to purchase cocaine that night for a Super Bowl party at his home. Instead of cocaine, however, **Pannell** gave V-1 a bag of white powder, similar in appearance to cocaine, but was in fact fentanyl. The brothers then returned to the party at V-1's house where they shared what they thought was cocaine with their friends, Victim-3 ("V-3), Victim-4 ("V-4"), and Witness-1 ("W-1"). Within a matter of hours, all five individuals suffered overdose reactions. Four of them died. W-1 survived.

11.     The next morning, officers, first responders, and investigators from the South Lake Tahoe Police Department (SLTPD), South Lake Tahoe Fire Rescue (SLTFR), the El Dorado County Sheriff's Office (EDSO), and the Federal Bureau of Investigation, responded to a 911 call reporting four overdose

1    deaths at the residence on Roger Avenue.

2    　　　　12.    Within a few hours of the first report of the overdose event, a person who wished to

3    remain anonymous reported to investigators that the person who sold the drugs to V-1 and V-2 that night

4    was a man known by the moniker "Frog," whose real name was **Timothy Austin Pannell**.[1]

5    　　　　13.    Consistent with the anonymous report, subsequent interviews of **Pannell**'s associates and

6    the surviving victims, as well as data from the associated telephones, demonstrated that V-1 and V-2 had

7    met with **Pannell** after the Superbowl on February 11, 2024, in the parking lot of Sierra Community

8    Church to purchase cocaine. **Pannell** gave fentanyl to V-1 and V-2 instead of cocaine. According to

9    multiple interviews of his associates, when **Pannell** realized that he had given fentanyl to V-1 and V-2,

10   he tried to contact V-1 with multiple phone calls and, having failed to reach V-1, drove to V-1's

11   neighborhood to try to find him, but was unsuccessful.

12   　　　　14.    In a post-arrest interview with officers several days later, **Pannell** initially denied selling

13   drugs at all. But, he eventually admitted to dealing drugs, including selling cocaine to V-1 in the past.  A

14   search of **Pannell**'s telephone revealed that, after **Pannell** learned of the overdose deaths, and just

15   before his scheduled meeting with EDCP, **Pannell** deleted from his phone the encrypted Signal

16   Application, in an apparent attempt to hide his communications with V-1.

17   　　　　**B.    Four Overdose Deaths From Fentanyl**

18   　　　　15.    On February 12, 2024, at approximately 9:10 a.m., SLTPD received a 911 call reporting

19   multiple overdoses at 596 Roger Avenue, Unit A, South Lake Tahoe.  Law enforcement and emergency

20   fire and medical personnel responded to the scene and attempted to aid the five overdose victims.  First

21   responders noted almost immediately that four of the victims were deceased, with no chance of

22   recovery.  SLTPD identified the deceased as V-1, V-2, V-3, and V-4.  The fifth victim, W-1, survived

23   the overdose.  He was transported to the local emergency room and interviewed by SLTPD personnel.

24   W-2, who had not taken any cocaine or fentanyl at the party, was interviewed at the scene, and again at

25   the SLTPD's offices. (These interviews are discussed below.)

26

27   　　　　[1] Investigators in South Lake Tahoe were familiar with **Pannell** because in he had been
     convicted on state charges for possession of cocaine for sale while armed with a machine gun in 2021,
28   for which he had served a year in jail.

3

16.    During the initial response, one of the first SLTPD officers to arrive began CPR on V-2 and asked W-2 what the victims had taken.  W-2 replied that they had taken "this" and picked up a small baggie of white powder from a coffee table in the living room.  (See photograph, inset.)  The officer told W-2 to put the baggie back on the table and asked her to stand in front of the house to direct emergency personnel who were en route.



17.    The same officer asked W-1, who was trying to perform CPR on V-4, at what time the four victims had used the substance. W-1 replied that they had taken it the night before.  Once additional officers and emergency personnel arrived, the officer secured the baggie of white powder.  An SLTPD evidence technician later conducted a field test to examine the substance, which returned a positive result for fentanyl, and tested negative for cocaine.  The technician later weighed the baggie and its contents, finding it to weigh roughly 2 grams (gross).

18.    Because the four deaths did not appear natural, nor related to carbon monoxide poisoning, SLTPD secured the scene and obtained a search warrant.  When officers first arrived, the bodies of V-4 and V-2 were on the living room floor, adjacent to a couch.  V-3's body was on the kitchen floor, and V-1's body was on the floor in an upstairs bedroom.  The home appeared to be generally well kept and neat, with no signs of a physical altercation or violence having occurred.  The kitchen and living room had appetizers, food, and beverages set out, apparently from the Super Bowl party the night before.

19.    EDSO Coroner Detectives examined each body in place. They noted no fresh external injuries or obvious signs of trauma to any of the bodies.  At least two of the victims appeared to have been dead for hours before the 911 call.

20.    Investigators applied for and obtained warrants to search the four victims' telephones.

**C.    Interviews with Witness-2**

21.    An SLTPD detective interviewed W-2 at the scene.  W-2 recounted that she was at V-1's home for a Super Bowl party, with V-2.  She indicated that others at the party had taken cocaine near the game's halftime, but W-2 did not.

22. W-2 recalled that, after the Super Bowl ended, V-1 and V-3 went to get more cocaine (in a subsequent interview, W-2 corrected herself and indicated that it was V-2 who went with V-1). W-2 believed they had gone somewhere in the town nearby, because they were back quickly. W-2 said that V-1, V-2, V-3, V-4, and W-1 then took lines of this second round of white powder, believing it to be cocaine. W-2 recalled going to sleep on the couch shortly thereafter.

23. W-2 recalled waking up the next morning at around 8 a.m. and telling V-2, whom she believed to be asleep near her, that they had to get up because she had to go to work. She then fell back to sleep and was woken sometime later by W-1, who was calling for help and trying unsuccessfully to wake V-4, who was on a couch. W-2 moved V-4 to the floor and attempted CPR on her. She realized the two others nearby, V-3 and V-2, were unconscious. She attempted CPR on V-2. Because she could not do CPR on all of them, W-2 told W-1 to call 911.

24. In response to detectives' questions, W-2 said that those at the party had used alcohol, marijuana, and cocaine, but not methamphetamine, fentanyl, or heroin, as far as she knew. W-2 did not recall ever having seen V-2 or V-1 use fentanyl, methamphetamine, or heroin. W-2 estimated that V-2 took approximately four or five lines of the white powder that night. When asked where the "cocaine" had come from, W-2 said she believed that details would be on V-1's phone because he had been the one to arrange the deal that he and V-2 then went off to do.

25. During a follow-up interview at the SLTPD offices, W-2 provided the same details as above. She reiterated that the four victims initially used cocaine from one baggie, around halftime of the game, which V-1 and V-3 already had when she and V-2 had arrived. Once the contents of this bag were consumed, later in the game, V-1 said he would get in touch with his cocaine supplier and, shortly thereafter, indicated that their "pickup" was ready. V-2 offered to drive V-1 on the errand. W-2 estimated that they were gone for approximately 20 to 30 minutes. W-2 assumed they drove to the location to get the cocaine, but she had dozed off around this time.

**D.    Interview with Witness-1**

26. W-1 was transported to Barton Hospital for treatment for overdose symptoms, where SLTPD Detective Nixon interviewed him. W-1 told Det. Nixon that he had been at a Super Bowl party at his residence, 596 Roger Avenue, with V-4, his two roommates, V-1 and V-3, as well as V-2, W-2,

and a friend named Jon.  According to W-1, during the game's half-time break, V-1, V-2, V-3, V-4, Jon, and W-1 took cocaine, which was already at the house.[2]  The group took additional cocaine as the game went on and had consumed it all before the game ended.

27.    Consistent with W-2's account, W-1 recalled that, around the time the game ended, V-1 and V-3 discussed getting more cocaine.  W-1 recalled V-1 contacting his cocaine supplier by telephone.  V-2 offered to drive V-1 to meet the supplier, and they left not long after the game had finished.  W-1 understood that they were going to a housing area known as the Sierra Tract.  (Note: the Sierra Tract is the neighborhood where **Pannell** lived).  V-1 and V-2 returned about 20 minutes later with what W-1 said appeared to be cocaine.  W-1 recalled that Jon left the party when the game ended.

28.    W-1 recalled V-1 "chopping" the powder into lines, which the five of them (including himself) took, at approximately 9:30 p.m.  A short time later, W-1 went upstairs to V-1's room, where he found V-1 unconscious.  He could not wake V-1, but assumed he was drunk.  Shortly thereafter, W-1 also lost consciousness.  He awoke the next morning, around 6 a.m., unable to move his legs properly.  He saw V-1, still unconscious, and tried to wake him.  W-1 recalled that V-1 grumbled slightly but did not wake up.  W-1 crawled down the stairs to his own room, where he fell asleep again.

29.    At approximately 9 a.m., he woke up and went into the living room where he found V-2, V-3, and V-4 unconscious.  He started screaming for help.  W-2, awoken by W-1's screams, started CPR on the unconscious individuals while W-1 called 911.

30.    SLTPD investigators obtained a search warrant for a blood draw from W-1, to identify the drug on which he had overdosed, and which had likely killed W-1's friends.  Subsequent lab analysis showed that W-1's blood had a concentration of 5.6 ng/mL of fentanyl.  W-1's blood also tested positive for benzoylecgonine (a metabolite of cocaine), and norfentanyl (a metabolite of fentanyl).

---

[2] The halftime of the Super Bowl in 2024 started roughly at 5:30 p.m. Pacific Time.

**E.    Search of Victims' Residence**

31.    While SLTPD personnel interviewed W-1 and W-2, other investigators applied for and obtained a search warrant for the residence.  Officers executed the search warrant and seized all the victims' telephones and all narcotics present.  While assisting with the execution of the warrant, FBI SA Patton observed an empty plastic baggie on a nightstand in V-1's bedroom, upstairs, which appeared to contain a white powdery residue. (See photograph, inset.) SA Patton also observed an unused NARCAN package in the bedroom.



32.    Investigators seized the small baggie identified by W-2 as the baggie that held the substance on which the five victims had apparently overdosed (Item #1B4), the empty baggie with white powdery residue from V-1's nightstand (Item #1B8), 48 LSD tabs (Item #1B1), a glass jar of psilocybin mushrooms (Item #1B2), and a bag of psilocybin mushrooms (Item #1B3).

33.    These items were later sent to a DEA's Western Laboratory, which identified them as follows:

- Item #1B1: Lysergic Acid Diethylamide (LSD)
- Item #1B2: Psilocin & Psilocybin
- Item #1B3:  Psilocin
- Item #1B4: N-Phenyl-N-[1-(2-phenylethyl)-4-piperidinyl] Propanamide ("fentanyl") (calc. as hydrochloride); net weight: 1.703 g ± 0.002 g.
- Item #1B8: Cocaine (Residue)

34.    These results corroborate W-1 and W-2's statements that the substance that had come from the first baggie was cocaine.  The substance from the second baggie was fentanyl.

**F.    Pannell identified as the drug dealer "Frog"**

35.    Within six hours of the first report of the overdose deaths, SLTPD received an anonymous tip reporting that **Austin Pannell**, known by the moniker "Frog," had been released from jail eight months earlier, but had continued selling cocaine and fentanyl, as well as using these same drugs himself.  The tipster indicated that he/she believed that **Pannell** was the person who had sold the

7

drugs to the four individuals who had overdosed and died.

36.    Local law enforcement and federal agencies were familiar with **Pannell** and his history as a drug dealer in and around South Lake Tahoe.  In August 2021, **Pannell** was arrested during a joint investigation involving the FBI, SLTPD, Douglas County Sheriff's Office (DCSO), EDSO, DEA, and the El Dorado County District Attorney's Office (EDCDA).  During the execution of a federal search warrant by an FBI SWAT team at residence, investigators encountered **Pannell** and determined that he was in possession of several ounces of cocaine, multiple firearms, including a fully automatic handgun, and body armor.  **Pannell** was convicted of the resulting drug and gun charges in El Dorado County and received a five-year prison sentence, with three years' probation to follow.  **Pannell** served roughly one year and was released in August 2022.

37.    Just over a year later, in November 2023, an FBI confidential human source (CHS) reported that an individual using the moniker "Frog" was selling fentanyl in the South Lake Tahoe area. At the time, investigators were unaware of Frog's real name.[3]

38.    On December 20, 2023, the CHS reported that Frog had asked how much the CHS usually paid for "fetty"[4] and stated that he (Frog) could sell the CHS fentanyl at a cheaper price.

39.    On December 22, 2023, the CHS reported that Frog was using telephone number XXX-XXX-7926.

40.    On January 25, 2024, the CHS reported learning that Frog's real name was Austin **Pannell** and that he lived in a neighborhood off Al Tahoe Boulevard in South Lake Tahoe. The FBI directed the CHS to setup a controlled purchase of powder fentanyl or cocaine from **Pannell**.

41.    On January 28, 2024, the CHS provided a screenshot of a text communication from

---

[3] The CHS received financial compensation for the CHS's efforts in assisting law enforcement in this case, to assist the CHS to pay for necessities, including lodging, food, telephone services, transportation, and other basic needs. The CHS has participated in multiple successful operations and arrests.  Investigators have corroborated information the CHS provided during the course of this investigation through law enforcement databases checks, surveillance, other reporting, acquiring physical evidence, and have found it to be reliable. The CHS's criminal history includes the following convictions: (1) Take Vehicle w/o Consent [Warship Felony] (2009); (2) Manufacture Controlled Substance, Involve Firearm [Felony] (2014); and (3) Battery [Misdemeanor] (2025) (the conduct in question occurred in September 2023, before the CHS had started working with law enforcement, but the conviction was not finalized until March 2025).

[4] "Fetty" is a common term used by those who buy and sell drugs to refer to fentanyl, most often in its powder form, as opposed to pill form.

**Pannell** in which **Pannell** offered the CHS cocaine. **Pannell** explained that he was offering the cocaine at a low price and encouraged the CHS to do business with him, adding that he always had "them" on hand (referring to quantities of drugs).

42.    Around January 30, 2024, the CHS provided two communications with **Pannell** via the Signal messaging application, in which **Pannell** (calling himself "Frog") indicated that he would give a discount to the CHS, if the CHS was willing to buy more cocaine.[5]  **Pannell** then sent pictures of the cocaine he was selling. The CHS and **Pannell** continued to discuss prices. A review of the communications between **Pannell** and the CHS showed that **Pannell** had set his Signal messages to disappear automatically after 30 minutes. This controlled purchase eventually failed to occur due to CHS limitations.

43.    On February 9, 2024, two days prior to the four overdose deaths, the CHS reported that **Pannell** had acquired additional cocaine for sale.

### G.    Pannell's arrest and subsequent investigation

44.    After receiving the information from the anonymous tipster that identified "Frog" as the drug dealer responsible for the deaths, the FBI contacted EDCP to ascertain if **Pannell**'s real address had been identified.  EDCP reported that they had developed information which indicated that **Pannell** was possibly staying at 2533 Osbourne Avenue, South Lake Tahoe. The FBI conducted surveillance at the address.  EDCP reported that **Pannell** was in fact coming in at that time for a pre-planned probation meeting.  The FBI notified SLTPD, who then detained **Pannell** at EDCP when he arrived for the meeting.  During this contact, **Pannell** provided a different address, which also did not appear to be where he was actually living. Investigators seized **Pannell**'s telephone at that time. Concurrently, investigators conducted a probation search of **Pannell**'s real residence and located indicia of drug sales including Xanax pills, a digital scale, a glass container in the trash with fentanyl residue, a Ziploc bag in the trash with fentanyl residue, and $1,660 hidden inside a fake paint can.

---

[5] According to an open source query of the Signal application, including Signal's own website, indicates that it is a "a free, open-source, encrypted messaging app that prioritizes user privacy. It uses end-to-end encryption, meaning only the sender and recipient can read the messages, protecting them from being intercepted by anyone, including Signal itself. The app also offers features like disappearing messages and group chats."  The user can adjust the settings on the Signal App to delete messages after a certain amount of time after they have been sent or received.

**H.**   **Interview with W-3**

45.   While the probation search occurred on February 12, 2024, investigators interviewed a close associate of **Pannell**, Witness-1 ("W-3"), who was with **Pannell** on the day/night of the Super Bowl, February 11, 2024.  Investigators interviewed W-3 three times on three different dates.

46.   Initially, W-3 denied using fentanyl, claimed that **Pannell** did not sell drugs, and denied having gone anywhere on the night of the Superbowl.  W-3 later stated that he/she and **Pannell** had gone on a drive around midnight, after the Superbowl.

47.   During a second interview on the subsequent day, W-3 stated that W-3 and **Pannell** had driven around the "Y" intersection in South Lake Tahoe, after the Superbowl, that **Pannell** sold cocaine and marijuana in the past, and was unsure if **Pannell** had made any drug deals on the night of the Superbowl. W-3 did remember that **Pannell** had called a friend approximately 15 times around 11 p.m. but could not get ahold of the friend.[6]  W-3 recalled **Pannell** being upset that he could not reach the friend – he began crying and stated that he had "messed up."  While **Pannell** made these calls, he had W-3 drive him around in vicinity of 13th Street where W-3 understood was the area in which **Pannell**'s friend lived, and that **Pannell** was trying to the friend's car or any indication of his friend's specific house.[7] The next day, W-3 learned that this friend was one of the four people who had died.

48.   During a third interview, on February 14, 2024, W-3 recalled that at some point in the evening following the Super Bowl, **Pannell** had reached into his pockets and removed some baggies, one of which contained cocaine.  According to W-3, **Pannell** became panicked and starting questioning out loud to himself why he had these baggies specifically.  He became distraught and W-3 figured out that **Pannell** had accidentally given the wrong bag to V-1, and the cocaine **Pannell** had found in his pocket was what he should have given to V-1.  At that point, W-3 indicated, **Pannell** started calling V-1 frantically.

49.   W-3 recalled that **Pannell** and W-3 decided to try to find V-1, and drove in W-3's car to the area of 13th Street at **Pannell**'s direction. They knocked on at least one door after seeing a car in

---

[6] Telephone data from V-1's phone shows that **Pannell** tried 17 times to call V-1 that night.  (See below.)

[7] V-1's house is in this neighborhood.

front that Pannel thought may have belonged to V-1, but they were unable to find him.  W-3 indicated that **Pannell** had told W-3 that V-1 had been with his brother when **Pannell** had met them earlier that evening.

50.     W-3 explained that **Pannell** used fentanyl, and had it on him that night, but that he did not sell it, but did occasionally sell cocaine.  According to W-3, **Pannell** had not mixed up drugs before but this time had been "just a mistake." During W-3's conversations with **Pannell**, W-3 recalls **Pannell** being worried that they "already used it." When they returned to the house, their friend Witness-4 ("W-4") was still at the house, along with another resident of the house. The four of them talked about "all possible scenarios."  They discussed other places to check for V-1 and how they were hoping nothing bad happened.  They discussed both the best- and worst-case scenarios for V-1. W-3 believed that V-1 had intended to buy one gram of cocaine, but that **Pannell** had given V-1 two grams of fentanyl.

51.     Investigators interviewed W-4, who confirmed that he had been at **Pannell**'s residence on Osborne Avenue during the Super Bowl but had left early.  W-4 said that, after the Super Bowl, he had received several calls from W-3's phone.  W-4 stated the calls were on speaker phone, with **Pannell** and W-3 on the other end.  W-4 recalled that they were upset to the point that W-4 could not work out what they were talking about.  W-4 was able to make out their saying they "were worried about them," and did not know what to do.  W-4 did not know who or what **Pannell** and W-3 were talking about until the next morning, when he learned about the four deaths from a friend, and assumed they were connected.

### I.    Analysis of Victim-1's Telephone

52.     While the above investigation was ongoing, investigators obtained a search warrant for V-1's mobile telephone.  On the phone, SLTPD Detective Morrison found text messages between V-1 and a contact named "Eric Plug" near the time the game ended, when V-1 had discussed getting more cocaine for the party.[8]  V-1's telephone data indicates that he had made payments to "Eric Plug" multiple times in the weeks preceding the party.  (See screenshot of Apple Pay payment history, below.) It appears that, following the depletion of the first amount of cocaine, V-1 contacted "Eric Plug" to get

---

[8] Investigators were able to identify "Eric Plug" from the associated telephone number and other sources.  This affidavit omits his true name, as his conduct is not charged here.

more, but "Eric Plug" was not available.[9]

| Time | From | To | Content |
|------|------|-----|---------|
| 7:19 p.m. | V-1 | Eric Plug | "what up man you good to swing by any chance?" |
| 7:19 p.m. | Eric Plug | V-1 | "yoo my bad g not home rn let you know when I am." |
| 7:20 p.m. | V-1 | Eric Plug | "All good homie." |

53.    V-1 then contacted a person listed in his telephone as "Frog." Investigators confirmed that the number for "Frog" in V-1's phone was in fact **Pannell**'s number, (XXX) XXX-7926, which had been provided by the FBI CHS initially, and later confirmed by a search of **Pannell**'s phone.

54.    Det. Morrison searched data from the Signal App on V-1's phone. These logs showed that V-1 had been in contact with Frog using the Signal App multiple times on the evening of February 11, 2024, beginning around 8:30 p.m.  They also show that, not long after V-1 stopped communicating with Frog that night, Frog started calling V-1 repeatedly, multiple times a minute, for about 10 minutes. Phone data shows that V-1 answered none of these calls.

a)    Outgoing telephone call from V-1's telephone to Frog at 8:26 p.m.

b)    Signal audio call at 8:26 p.m. with Frog

c)    Signal video call at 8:54 with Frog (cancelled)

d)    Unanswered video call 8:54 p.m.

e)    Outgoing voice call from V-1's telephone to Frog 8:54 p.m.

f)    Outgoing voice call from V-1's telephone to Frog 8:54 p.m.

g)    Signal audio communication with Frog 8:55 p.m. (12 Seconds)

h)    Signal audio communication with Frog 8:59 p.m. (22 Seconds)

i)    Outgoing voice call from V-1's telephone to Frog 9:06 p.m.

j)    Signal audio communication with Frog 9:07 p.m. (14 Seconds)

k)    Missed calls (17) from Frog at the following times: 9:41 p.m.; 9:42 p.m.; 9:42 p.m.; 9:42 p.m.; 9:43 p.m.; 9:43 p.m.; 9:44 p.m.; 9:44 p.m.; 9:45 p.m.; 9:46 p.m.; 9:46 p.m.; 9:47 p.m.; 9:47

[9] Investigators interviewed "Eric Plug" on June 6, 2024.  He denied having been in contact with V-1 on the day of the Super Bowl party and denied ever having sold him cocaine. The text messages and payments to Eric Plug on V-1's telephone, however, establish that this information was not true.

1   p.m.; 9:48 p.m.; 9:48 p.m.; 9:49 p.m.; 9:50 p.m.[10]

2       55.    Det. Morrison also examined the record of payments made through the Apple Pay

3   application on V-1's telephone.  He noted a string of payments between January 21 and February 8,

4   2024, to "Eric Plug," and to "Frog."  The payments were consistent with street drug prices ranging from

5   $40 to $80 per gram of cocaine:



**Photograph of V-1's phone, showing payments via Apple Pay to "Frog" (Pannell's moniker) and "Eric Plug."**

19      **J.    Geolocation Data from the phones of V-1, V-2, and Pannell**

20      56.    Investigators examined the geolocation data on the mobile phones of V-1, V-2, and

21  **Pannell**, for the hours surrounding V-1's acquisition of the additional drugs that night, and the ensuing

22  overdoses.  The following table is a timeline of events constructed from that data, supplemented with

23  communications data taken from V-1's telephone (described above).  The screen-captures included in

24  the table show the approximate locations for the telephones belonging to V-1 (green dot), V-2 (red dot),

25  and **Pannell** (blue dot), near the corresponding times.

26

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
    [10] As explained below, these calls appear to be **Pannell**'s frantic attempts to reach V-1 after
    **Pannell** realized he had sold fentanyl to V-1 instead of cocaine.

| Time | Details |
|------|---------|
| 8:26 p.m. | V-1 calls **Pannell** on Signal; call connects. |
| 8:44 p.m. | Signal Text - **Pannell** to V-1 "Yo" |
| 8:45 p.m. | Signal Text - V-1 to **Pannell** "Yo" |
| 8:46 p.m. | Signal Text - V-1 to **Pannell**: "head over?" |
| 8:46 p.m. | V-1 and V-2's location data shows them at residence on Roger Avenue. |
| 8:46 p.m. | **Pannell**'s location data shows him at his residence at 2533 Osborne Avenue, at Sierra Blvd. (diagonally opposite Sierra Community Church).  |
| 8:50 p.m. | V-1 and V-2's location data shows them leaving together from the house on Roger Avenue. |
| 8:54 p.m. | V-1 makes a call to **Pannell**; call does not connect. |
| 8:54 p.m. | V-1 calls **Pannell**; call connects. (12 seconds.) |
| 8:55 p.m. | V-1 and V-2's location data show them arriving at the parking area for Sierra Community Church. |
| 8:55 p.m. | Signal Text - **Pannell** to V-1 "Yea u there?" |
| 8:59 p.m. | V-1 calls **Pannell**; call connects. (22 seconds.) |
| 9:06 p.m. | V-1 calls **Pannell**; call connects. (14 seconds.) |
| 9:07 p.m. | **Pannell**'s location data shows him arrive at the parking area for Sierra Community Church. |



| 9:09 p.m. | Location data for all three shows them travel together around the block from the church to Reno Avenue – Sierra boulevard – Osborne Avenue, where the data shows them remain together for a couple of minutes. |
| --- | --- |
| 9:11 p.m. | V-2 and V-1's location data separates from **Pannell**'s location data; V-1 and V-2 go back to V-1's neighborhood, and **Pannell** returns to his home, 2533 Osborne Avenue |
| 9:16 p.m. | V-2 and V-1 arrive back at V-1's house on Roger Avenue (location of the Super Bowl party. |

| 9:41 p.m. | **Pannell** starts calling V-1 repeatedly; all calls go unanswered |
|---|---|

| +19256287926 | Frog | Incoming | 2/11/2024 9:41:36.028 PM |
|---|---|---|---|
| +19256287926 | Frog | Incoming | 2/11/2024 9:42:02.933 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:42:29.224 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:42:55.951 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:43:24.005 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:43:51.346 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:44:19.402 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:44:47.067 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:45:35.679 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:46:02.928 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:46:32.727 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:47:21.465 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:47:54.548 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:48:20.862 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:48:50.665 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:49:20.973 PM |
| +19256287926 | Frog | Incoming | 2/11/2024 9:50:05.404 PM |

| 9:46 p.m. | **Pannell** leaves his home while continuing to call V-1, driving to V-1's neighborhood. |
|---|---|
| 9:49 p.m. | **Pannell** arrives at V-1's neighborhood and drives slowly down several streets in the area. |



16

| | |
|---|---|
| 10:01 p.m. | After roughly ten minutes of driving around V-1's neighborhood, **Pannell** drives to Tahoe Big Cloudz Smoke Shop, where he arrives at 10:04 p.m. He stays for a few minutes before driving home. |
| |  |
| 10:08 p.m. | **Pannell** arrives at home where he stays the remainder of the night |

### K.    Analysis of W-3's Telephone

57.    W-3 provided consent to search his/her telephone. SLTPD Detective Spaeth conducted a search of W-3's phone data and found the following:

a)    On the night of the Super Bowl, W-3's telephone called W-4 at approximately 1 a.m.

b)    On the night of the Super Bowl, W-3's telephone called D.F. at 2:40 a.m. and 2:50 a.m. (During the interviews with investigators, discussed below, **Pannell** identified D.F. as his fentanyl source.)

c)    On the night of the Super Bowl, W-3's telephone showed multiple internet searches for "police calls near me," from which it appears that W-3 (or someone using her phone) was trying to find information on emergency incidents reported in the area. (See below.)

| | |
|---|---|
| Timestamp: | 2/12/2024 12:43:57 AM(UTC-8) |
| Source: | Chrome |
| Value: | recent police incidents el dorado county |
| Search Results: | |
| Searched In: | |
| Origin: | Unknown |
| Account: | |
| Service Identifier: | |
| Extraction: | File System |
| Manually decoded: | False |
| Source file: | EXTRACTION_FS_AFU.zip/root/private/var/ mobile/Containers/Data/ Application/3CC4873C-8BD4-4207- B731-64D2E48A71A4/Library/Caches/ WebKit/NetworkCache/Version 16/ Records/18A05FA49DDA9BDDBDE8E2B89C 3B3B30375D881D/ Resource/8BE2F4067E48E70312C8C9F7D91 4942C21603746 - 0x0 (Size: 12173 bytes) |

Search results for "police calls near me," from W-3's phone

**L.     Analysis of Pannell's Telephone**

58.     SLTPD applied for and obtained a search warrant for **Pannell**'s telephone.  Detective Morrison reviewed **Pannell**'s telephone. The forensic download of the phone showed that **Pannell** had a history of using the Signal application to discuss drug transactions.  The phone showed communication with several people with whom he discussed the sale of narcotics.  In one message, **Pannell** offered ecstasy for $80 per gram, "Xanax" for $12 a pill, and ketamine for $100 per gram.  In another text, **Pannell** indicated that he had "bars" (Xanax) and cocaine for sale. In another message, **Pannell** appeared to offer to trade cocaine for heroin or fentanyl.

59.     In addition, the phone's data showed that, on February 12, 2024, at approximately 1:24 p.m., the user of **Pannell**'s phone (presumably **Pannell** himself) uninstalled the Signal application from the phone.  This coincided with the time that **Pannell** was checking in for his appointment with El Dorado County Probation, just prior to being contacted by police in this investigation.

**M.     Interview with Pannell**

60.     During an in-custody interview on February 14, 2024, **Pannell**, under a *Miranda* advisement, which **Pannell** acknowledged, initially denied selling cocaine or fentanyl, denied leaving his house on the night of the Superbowl, denied having seen V-1 and his brother on the night they overdosed, and denied using anything other than regular text messages to communicate with V-1, whom he indicated was a friend from a DUI class. Eventually, **Pannell** admitted to selling cocaine to V-1 (but not for the past three weeks), admitted to using the Signal App to communicate with V-1, admitted to

leaving his residence on the night of the Superbowl, admitted talking to V-1 at approximately 9 p.m. on the night of the Superbowl, and admitted to attempting to contact V-1 (repeatedly) later that night, but stated it was because they had been supposed to meet up, but he had not heard from V-1. At one point in the interview, **Pannell** stated that he felt "remorse," "wished he could have done something," and that he "knew something was wrong" that night when he did not hear from V-1, but did not indicate why. **Pannell** did not admit to providing the fentanyl that caused the overdose deaths and claimed that the last person he sold cocaine to was V-1 approximately three weeks prior. Location data and communications from mobile phones associated with two of the victims and **Pannell** establish that **Pannell**'s denials of having sold V-1 cocaine no later than roughly three weeks in the past were not truthful.

### N.    State Conviction, Sentence, Release

61.    On March 11, 2024, **Pannell** pled guilty to a felony violation of California Health and Safety Code Section 11375(b)(1). On April 9, 2024, **Pannell** received a three-year prison sentence. Pannel was released from CDCR on or about April 22, 2025. On April 24, 2025, Pannel reported to EDCP that he was moving his belongings into back into his original probation address on Council Rock Road, South Lake Tahoe.

### IV.    REQUEST FOR COMPLAINT AND WARRANT

62.    Based on the foregoing information, there is probable cause to believe that, on or about February 11, 2024, **Pannell** distributed fentanyl, in violation of 21 U.S.C. § 841(a)(1). I therefore request respectfully that the Court issue a Criminal Complaint and Arrest Warrant for this charge against him.

### V.    REQUEST TO SEAL

63.    I further request that this Court issue an order sealing, until further order of the Court, all papers submitted in support of the criminal complaint and arrest warrant, including this application and affidavit, as well as the arrest warrant itself. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Based on my training and experience, I know that criminals actively search for criminal affidavits and warrants via the internet and disseminate them to other criminals as they deem appropriate, e.g., post them publicly online. Premature disclosure of the contents of this affidavit and related documents may have a significant and

1  negative impact on the continuing investigation and may severely jeopardize its effectiveness, including

2  by causing co-conspirators to flee, destroy or otherwise alter evidence, or to notify confederates.

3  Accordingly, there is good cause to seal these documents.

4       I declare under the penalty of perjury that the foregoing is true and correct, to the best of my

5  knowledge and belief.

6                           Respectfully submitted,

7

8                           /s/ Preston Patton
                         Preston Patton
                         Special Agent

9                           Federal Bureau of Investigation

10

11  Subscribed and sworn to me via telephone on:   April 25, 2025

12

Hon. Jeremy D. Peterson

13  U.S. MAGISTRATE JUDGE

14

15

Approved as to form by

16  AUSA JAMES R. CONOLLY

17

18

19

20

21

22

23

24

25

26

27

28

<u>*United States v. Timothy Austin Pannell*</u>
**Penalties for Criminal Complaint**

| **21 U.S.C. § 841(a)(1) – Distribution of fentanyl** |
| --- |
| Maximum Penalties:     Up to 20 years in prison; or Fine of up to $1,000,000; or both fine and imprisonment Supervised release term of 3 years, up to life. |
| Special Assessment:     $100 (mandatory on each count) |